UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

| | |
|---|---|
| JEFFERY T. ALBANEZE, MATTHEW B. COCHRAN AND KAITLYN P. WEATHERLY, | Civil Action No. 1:23-cv-07197 |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| -against- | |
| | **JURY TRIAL DEMANDED** |
| MARK D. BIEGEL AND BDO USA, P.A., | |
| Defendants. | |

-------------------------------------------------------------------

Plaintiffs JEFFERY T. ALBANEZE, MATTHEW B. COCHRAN, AND KAITLYN P. WEATHERLY by and through their undersigned counsel, as and for their first amended complaint against Defendants MARK D. BIEGEL and BDO USA, P.A ("BDO") allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs Jeffery T. Albaneze, Matthew B. Cochran, and Kaitlyn P. Weatherly ("Jeffery", "Matt", and "Kaitlyn", collectively "Plaintiffs") seek a declaratory judgment with respect to their post-employment obligations, if any, under BDO's Manager Agreement (the "Manager Agreement").

2.      Kaitlyn also brings this action for multiple acts of threats, intimidation, harassment, and retaliation perpetrated by Defendant Mark D. Biegel ("M. Biegel") and BDO against her and her team.

## THE PARTIES

3.      Jeffery is domiciled in and a citizen of the State of Florida.

4.      Matt is domiciled in and a citizen of the State of Florida.

5.      Kaitlyn is domiciled in and a citizen of the State of Florida.

6.      BDO is a professional services corporation organized under the laws of the State of Delaware with its principal place of business in the County of Cook, State of Illinois.

7.      M. Biegel is domiciled in and citizen of the State of Maryland.

8.      M. Biegel is an attorney admitted to practice law in the State of Maryland and is also a certified public accountant.

9.      M. Biegel is currently employed by BDO as its Wealth Advisory National Leader, and regularly transacts business in New York

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     In accordance with the Manager Agreement, the Parties agreed that the laws of the State of New York shall apply to any action brought under the Manager Agreement and that venue for any action or suit brought under the Manager Agreement will be in any federal or state court of competent jurisdiction in New York County, New York. (See BDO USA, LLP Manager Agreement ("Manager Agreement") (Ex. A; ¶19).)

## FACTS

**A.      Jeffery, Matt, and Kaitlyn worked together at LBA where they cultivated and originated numerous clients.**

12.        LBA Wealth Management LLC, ("LBA") was a small wealth advisory firm based in Jacksonville Florida.

13.        From June 2014 through May 2017, LBA Wealth Management LLC ("LBA") employed Jeffery as a wealth advisor/paraplanner.

14.        From January 2011 through May 2017, Matt was employed by LBA as a Portfolio Manager.

15.        From February 2014 through May 2017, Kaitlyn was employed by LBA as a wealth advisor.

16.        At LBA, Jeffery, Matt, and Kaitlyn originated numerous clients and specialized in providing wealth management services to those clients.

17.        While at LBA, Jeffery, Matt, and Kaitlyn developed personal and professional relationships with their clients.

**B.        In 2017, Jeffery, Matt, and Kaitlyn joined BDO as employees, and brought their clients with them.**

18.        In or about the spring of 2017, LBA informed its employees that it was being acquired by BDO.

19.        BDO offered Jeffery, Matt, and Kaitlyn employment as employees at will.

20.        Jeffery, Matt, and Kaitlyn were never offered partnership or an equity interest at BDO.

21.        Prior to their employment, BDO required Jeffery, Matt, and Kaitlyn to sign its Manager Agreement.  (Manager Agreement) (Ex. A).)

22.        In May 2017, Jeffery, Matt, and Kaitlyn joined BDO as employees in its wealth advisory practice in Jacksonville, Florida

23.        Jeffery, Matt, and Kaitlyn brought with them to BDO their client relationships that they had created and maintained at LBA.

24.        From 2017 to the present, Jeffery, Matt, and Kaitlyn worked together at BDO's wealth advisory practice and serviced many of the same clients that followed them from LBA to BDO.

25.        In addition to the clients Jeffery, Matt, and Kaitlyn brought to BDO, they developed and cultivated several relationships with new clients at BDO.

26.        Jeffery, Matt, and Kaitlyn have always performed their job duties in exemplary fashion.

**C.      In May 2023, BDO looks to exit the wealth advisory business and sell its wealth advisory practice to Choreo.**

27.        On May 23, 2023, M. Biegel, BDO's Wealth Advisory National Leader, informed Matt and Kaitlyn that BDO was getting out of the wealth advisory business.

28.        M. Biegel stated the reason for BDO's exit from the wealth advisory business was that it presented inherent conflicts with BDO's substantial accounting and audit practices.

29.        M. Biegel said BDO was selling its wealth advisory business to private equity firm Choreo, LLC ("Choreo").

30.        M. Biegel said that a call would be set up the following week to introduce Matt and Kaitlyn to Choreo's CEO, Larry Miles ("L. Miles").

31.        On June 1, 2023, L. Miles contacted Kaitlyn and told her that she and Matt would receive offers of employment from Choreo by June 6, 2023.

4

32.        L. Miles made it clear that if Matt and Kaitlyn accepted Choreo's offer of employment, they would be required to sign new employment agreements, including Choreo's confidentiality and non-solicitation agreements.

33.        On June 6, 2023, M. Biegel called Jeffery, Matt, and Kaitlyn individually and explained in further detail that BDO would be selling its wealth advisory practice to Choreo.

34.        Jeffery, during his call with Mr. Biegel, inquired of the approximate deadline for when he, Matt, and Kaitlyn would have to review and sign Choreo's proposed new agreements, and asked how long they would have to negotiate their terms.

35.        M. Biegel responded, "Oh Jeffery, there will be no negotiating."  M. Biegel then suggested that since he (M. Biegel) is an attorney, and once Jeffery, Matt, and Kaitlyn received Choreo's proposed agreements, he would walk them through the terms and explain everything to them.

36.        On June 8, 2023, Matt and Kaitlyn received Choreo's proposed agreements, which included an offer letter, confidentiality and non-solicitation agreements, Unit Grant Agreement, and Advisor Incentive Overview.

37.        The terms of the proposed Choreo agreements were vastly different than the terms of the agreements Jeffery, Matt, and Kaitlyn had with BDO. These differences included, among other things, less compensation and significantly more restrictive post-employment obligations.

38.        On June 12, 2023, M. Biegel called Kaitlyn and inquired where she stood with respect to the proposed Choreo agreements. Kaitlyn reminded M. Biegel that she had only just received the proposed documents, and had not yet had them reviewed by an attorney. M. Biegel

stated that he really wanted her to go to Choreo, and said that he did not want to have to fly to Jacksonville to fire her support staff.

39.        M. Biegel also asked Kaitlyn whether she knew where Matt stood on his decision to join Choreo.

40.        On June 14, 2023, M. Biegel and Matt spoke.  During that conversation, Matt told M. Biegel that the compensation package proposed by Choreo was very different than what L. Miles and M. Biegel had previously told him would be the case, and the post-employment covenants were too restrictive because if he left Choreo for any reason, he could be prohibited from contacting any of his clients for two years. M. Biegel agreed with Matt that the post-employment restrictions were too restrictive and told Matt that he would look into it.

41.        On June 15, 2023, Matt and M. Biegel spoke again.  M. Biegel said that Choreo was going to adjust Matt's salary on the offer letter, but that his incentive compensation could not be guaranteed. M. Biegel also said that Choreo would not change the proposed post-employment restrictive covenants.

42.        On June 16, 2023, Matt and Kaitlyn each received an email from Choreo which included revised offer letters, together with the same confidentiality and non-solicitation agreements that they had previously received. The email to Kaitlyn indicated that the documents should be signed and returned no later than June 19, 2023.  The email to Matt indicated that the documents should be signed and returned no later than June 20, 2023.

43.        On June 16, 2023, Jeffery received his proposed offer letter, confidentiality and non-solicitation agreements, a Unit Grant Agreement, and an Advisor Incentive Overview, with a request to return his signed documents by June 19, 2023.

44.        Jeffery immediately responded to Choreo that he was away until June 20th, visiting family for Father's Day weekend, and would review the documents on his return.

45.        On June 21, 2023, M. Biegel met with Jeffery to inquire about Choreo's offer.

46.        Jeffery explained that he had only had one day to review the proposed documents but indicated that he had significant concerns about the proposed 2-year "non-touch restrictive covenant" and the compensation package which included a bonus left to the discretion of Choreo, instead of a non-discretionary bonus.

47.        M. Biegel advised that despite what was written in the agreement, Choreo would "take care" of him, Matt, and Kaitlyn in terms of compensation.  He then said that if Jeffery or his colleagues were ever unhappy with the post-employment restrictions, Choreo would "work something out."  M. Biegel further advised that Jeffery and his colleagues should trust Choreo because Choreo would not want to make them upset, and if they ever were unhappy, they could simply leave.  M. Biegel then said that the restrictive covenants in Choreo's proposed agreements, which prohibited contact with their own clients for two years, was most likely unenforceable as a matter of law.

48.        M. Biegel then advised Jeffery, Matt, and Kaitlyn that they could rely on M. Biegel's legal background in lieu of waiting for their own attorneys' reviews.

49.      On June 21, 2023, L. Miles emailed Jeffery, Matt, and Kaitlyn to explain Choreo's compensation structure.  In sum and substance, L. Miles told Jeffery, Matt, and Kaitlyn that through 2023, their compensation would remain the same, and for 2024, they would continue to earn in accordance with BDO's incentive compensation schedule for the clients that followed them to Choreo.  Significantly, L. Miles then confirmed that Choreo was unwilling to commit to a compensation plan beyond 2024.

50.      Despite what L. Miles wrote in his email to Jeffery, Matt, and Kaitlyn, the proposed Choreo Agreements failed to include compensation which Jeffery, Matt, and Kaitlyn are currently entitled to receive under BDO's plan. Additionally, Choreo's proposed agreement included an incentive compensation plan which was discretionary as opposed to BDO's fixed, non-discretionary plan.

51.      On June 22, 2023, Jeffery advised M. Biegel that he had contacted multiple attorneys, but had been unable to locate one that was both available and suitable to provide immediate legal advice regarding Choreo's proposed agreement.

52.      Jeffery then questioned what he perceived to be very one-sided commitments required under the agreements prepared by Choreo.

53.      At this point, M. Biegel said that Stephan Ferrara, BDO's Chief Operating Officer, demanded that Jeffery, Matt, and Kaitlyn sign the contracts with Choreo "as is," no later than the following day, June 23, 2023.

54.      M. Biegel then threatened Jeffery and said that Stephen Ferrara was "not the nicest person in the world," and that he (M. Biegel) was trying to keep things positive.

8

55.      M. Biegel then stated that Choreo had done as much as it could do, and if Jeffery, Matt, and Kaitlyn did not sign, Stephen Ferrara "is a jackass" and "has his way of doing things."

56.      Jeffery then asked M. Biegel what he would do if he was in Jeffery's position, and told M. Biegel that he felt like he was not being given much of a choice.  M. Biegel responded that he understood if it felt like he and his colleagues had "a gun to their heads," and that if he, Matt, and Kaitlyn did not sign the Choreo agreements, Stephen Ferrara and BDO would "sue the shit" out of them.  M. Biegel reiterated that he wanted Jeffery, Matt, and Kaitlyn to go to Choreo happy, and not because Stephen Ferrara and BDO have "a gun to your head."

57.      Jeffery then asked, "what does that mean, a gun to our head?"  M. Biegel responded that Stephen Ferrara's way of solving everything is "with a hammer."  M. Biegel further threatened that BDO was drafting a "major lawsuit" against Jeffery, Matt, and Kaitlyn, which would be filed if they did not sign the Choreo agreements.

58.      M. Biegel reiterated again that if Jeffery, Matt, and Kaitlyn did not sign with Choreo, they would have to face Stephen Ferrara, who solves everything "with a hammer."

59.      M. Biegel then acknowledged that Jeffery and his colleagues were provided insufficient time to review Choreo's offer and related documents.  But M. Biegel made it clear that the documents had to be signed by Jeffery, Matt, and Kaitlyn no later than lunchtime the following day.

60.      Jeffery responded that he had only had a short time to review the documents, and would not be able to have an attorney review them by the following day.

9

61.       M. Biegel then started advising Jeffery on the legal implications of the restrictive covenants contained in the Choreo agreements and said, "I will go through and explain every item" and exclaimed, "I am a lawyer."  M. Biegel also stated that he would prefer that Stephen Ferrara not get involved because "he's a fucking asshole."

62.       Jeffery asked M. Biegel if it would be a problem if he was not ready to sign by the following day.  M. Biegel replied, maybe tomorrow by the end of day, and then Stephen Ferrara is going to tell you that what he does involves using a blunt hammer.  M. Biegel continued making threats and said to Jeffery that when you get to litigation, you bankrupt yourself and nobody wins.

63.       M. Biegel then referenced Matt and said that if Matt does not sign the Choreo agreement, BDO and Stephen Ferrara are aware that he has four kids, and they would sue Matt regardless of the merit of such a suit, just to ruin him and his family.  M. Biegel then told Matt the story of Eric Sobota.  M. Biegel explained that Eric Sobota was a former BDO partner who had done some bad things, and that "BDO was not good either."  M Biegel continued by saying, "it was two shitting on each other," and BDO is going to bankrupt the guy.

64.       M. Biegel further explained that Eric Sobota's name is brought up at every BDO partner meeting, just to let the partners know that if they fail to comply with BDO's wishes, they will end up like him.  M. Biegel reiterated that BDO was going to bankrupt Sobota, and was unconcerned that his life was going to be ruined.

65.       M. Biegel then stated that people should "get the fuck out of BDO" because it's not a good organization.

10

66.       M. Biegel then said that the reason Stephen Ferrara is on his way out of BDO is because BDO's CEO, Wayne Berson, recognizes that BDO is going to lose a lot of talent if it utilizes someone who solves everything with a hammer.

67.       On June 22, 2023, M. Biegel again reached out to Kaitlyn to determine where she stood on Choreo's agreements.  Kaitlyn expressed her hesitancy about the two-year no contact prohibition with her own clients, as well as other concerns.

68.       M. Biegel then told Kaitlyn the names of the BDO employees that had signed with Choreo, and told her that she was holding up the process.  M. Biegel also told Kaitlyn that Stephen Ferrara was getting very upset.  M. Biegel then exclaimed, "Stephen Ferrara will destroy you; he will destroy your family; you're underestimating what not signing will do."  M. Biegel then went on to say that "Matt is underestimating what Stephen Ferrara will do.  He will destroy his family, he does not care."

69.       On June 22, 2023, M. Beigel and Kaitlyn had a follow-up call during which M. Biegel again made explicit threats, including that Stephen Ferrara is a "destroyer."  M. Biegel stated, "the only way Stephen Ferrara knows how to rule is with an iron thumb, and he just continues to pressure you."  M. Biegel then laughed and said, "if you want to have a home demolition party, you invite Stephen Ferrara, because he is the hammer and will help to destroy the family walls."  M. Biegel pleaded with Kaitlyn saying, "please sign, you have to sign."

70.       Kaitlyn asked why she was being threatened, and told M. Biegel that she had not made any final decisions.  She said to M. Biegel that maybe she would be a stay-at-home mom.  M. Biegel replied "If you plan to do that, you should just take the money from Choreo and then resign after the LTIP money hits so at least you get the money."  Kaitlyn replied that what M.

Biegel proposed did not seem ethically right.  M. Biegel said she needed to decide, and Stephen

Ferrara wanted to sign the deal by Friday, and that she was already holding everything up.

71.        On June 23, 2023, M. Biegel again called Jeffery and further pressed him on signing

the Choreo agreements. Jeffery explained that he had contacted two attorneys to review the

documents, and that neither was available immediately to provide him legal advice.

72.        M. Biegel then asked for Jeffery's final decision. Jeffery responded by asking if it

was possible to simply honor his current employment agreement with BDO, which he signed six

years ago.  M. Biegel responded that what Jeffery asked would not be possible.

73.        M. Biegel began laying out options should Jeffery and his colleagues not sign the

Choreo agreements, threatening that Stephen Ferrara will be vindictive, and threatening that

litigation is absolutely what BDO will do.

74.        Jeffery reiterated to M. Biegel that the agreement proposed by Choreo required him

and his colleagues to make legal promises to Choreo, in exchange for no guarantee in return.  M.

Biegel responded that they would have to have faith that their compensation would be taken care

of and stated that the restrictive covenants in the Choreo agreements would not be enforceable.

75.        M. Biegel also advised Jeffery that at some point, Choreo would happily negotiate

any future dispute that arose.  M. Beigel then suggested that Choreo could possibly raise Jeffery's

signing bonus from $100,000 to $200,000.  Jeffery made it clear to M. Biegel that money was not

his only issue, as the agreements as written would prevent him from serving his clients for two

years after he was no longer employed by Choreo.

76.        Also on June 23, 2023, M. Biegel contacted Kaitlyn and again asked her where she stood on Choreo's agreements.  M. Biegel stated that he was trying to keep Stephen Ferrara from calling her.  Kaitlyn then told M. Biegel that she decided not to sign the Choreo agreements because they were too one-sided, and that they only benefited Choreo.  M. Biegel then stated that what happens next was out of his hands, and that Monday would likely be her last day of work at BDO.

77.        After this call, Kaitlyn wrote to Catherine Moy in human resources at BDO. Kaitlyn's email stated:

> Dear Cathy,
>
> I'm a Managing Director with BDO Wealth in the Jacksonville, Florida office.
>
> I'd like to meet with you regarding recent conversations with Mark Biegel, the national director of BDO Wealth. During multiple discussions this week around signing the Choreo contract, I've been harassed, threatened and told my not signing would eliminate jobs in my local office.
>
> Please let me know your availability to discuss.
>
> Thank you,
>
> Kaitlyn Weatherly

78.        On Sunday, June 25, 2023, Jeffery, Matt, and Kaitlyn spoke with Stephen Ferrara. Stephen Ferrara told them that he was not able to address any of their concerns.

79.        Stephen Ferrara indicated that if their intentions were to leave BDO and take clients with them, he would have no choice but to protect BDO's assets and sue them, even if there was no legal basis, for damages including the economic loss to BDO for their refusal to sign Choreo's agreements.

80.      Jeffery, Matt, and Kaitlyn explained to Stephen Ferrara that they had not made any definitive plans, and that the three of them were considering their individual options, which included taking positions in another field or industry.

81.      Jeffery said to Stephen Ferrara that if his choices were between handcuffing himself to Choreo, and staring down the barrel of litigation that could bankrupt him, he may choose another option, which would involve looking for and taking a job where he does not get sued.

82.      Stephen Ferrara responded by asking Jeffery why he would not just take the money and stick it out for a year or two at Choreo.  Jeffery said that he could not, in good conscience, mislead his clients by taking them to a firm where he had no intention of staying.

83.      On June 26, 2023, Kaitlyn met with Meghan Joans, Regional Senior Manager of Human Resources at BDO, and reported the threats, intimidation, and harassment that she received from M. Biegel, and informed Ms. Joans that she had been placed in an uncomfortable position during an already stressful time.  Kaitlyn complained that M. Biegel had clearly crossed a professional boundary and requested that her complaint be kept confidential.

84.      Despite Kaitlyn's request, her complaint was widely publicized within BDO.

85.      Furthermore, Kaitlyn's filing of a good faith complaint resulted in BDO's retaliation against her.

86.      For example, as soon as M. Biegel was made aware of Kaitlyn's complaint, he and BDO transferred several of her clients to another BDO wealth advisor.

**D.      <u>Unable to coerce Jeffery, Matt, and Kaitlyn to sign the Choreo Agreements, BDO fails to make compensation payments due on June 30, 2023.</u>**

87.      According to the terms of BDO's Incentive Compensation Plan dated October 17, 2019, BDO is obligated to pay incentive compensation to Jeffery, Matt, and Kaitlyn for the trailing twelve months, within 60 days of the fiscal year end.

88.      BDO's fiscal year ended on April 30, 2023.

89.      60 days after BDO's fiscal year end was June 29, 2023.

90.      BDO was obligated to pay Jeffery a total of $44,149.82 on or before June 29, 2023.

91.      BDO was obligated to pay Matt a total of $110,826.90 on or before June 29, 2023.

92.      BDO was obligated to pay Kaitlyn a total of $87,111.46 on or before June 29, 2023.

93.      Despite its legal obligation, BDO refused to pay Jeffery, Matt, and Kaitlyn their compensation.

94.      Jeffery, Matt, and Kaitlyn demanded payment of their compensation.

95.      On August 2, 2023, Matt and Kaitlyn had a telephone call with Stephen Ferrara. During the call, Mr. Ferrara asked if Matt and Kaitlyn were going to leave BDO if they were paid the compensation owed to them.

96.      Matt replied by explaining that his main concern was servicing his clients, which had been made increasingly more difficult because of the lack of direction from BDO and overall plan going forward, since BDO will be exiting the wealth advisory business.

97.      Additionally, correspondence sent by BDO to wealth advisory clients, including those served by Jeffery, Matt, and Kaitlyn, indicated that changes to existing wealth management advisors or client service teams were not expected, despite the sale to Choreo.  Matt informed both M. Biegel and Stephen Ferrara that the information being provided to clients by BDO was false, because he, Jeffery, and Kaitlyn were not going to Choreo.

98.      As of the date of the filing of this Complaint, Jeffery, Matt, and Kaitlyn are employed by BDO.

99.      Jeffery, Matt, and Kaitlyn have not solicited any clients currently being serviced by them at BDO to leave BDO.

100.      At the heart of this dispute is the prospective obligations, if any, of Jeffery, Matt, and Kaitlyn, given among other things, that (1) BDO is selling its wealth advisory practice to Choreo, (2) Jeffery, Matt, and Kaitlyn have declined to sign Choreo's employment offers, and (3) BDO had refused to pay Jeffery, Matt, and Kaitlyn their earned compensation

101.      On August 14, 2023, Matt wrote Stephen Ferrara as follows:

Dear Steve,

It has always been our intention to remain BDO employees.

Unfortunately, BDO decided to cease its wealth advisory practice and sell its wealth advisory business to Choreo. The employee agreements that Choreo offered to me, and which we were required to sign as a condition of our employment with Choreo, were very different than the terms of our BDO employment, and unacceptable.  For example, the Choreo confidentiality and non-solicitation agreements are significantly more restrictive than those in our current agreements with BDO. We were informed that the Choreo agreements were not negotiable, and that softening of the covenants "was not going to happen."

If the terms of our continued employment must change so significantly, we have no alternative but to find other means to support our families.

As you have requested that we make you an offer to leave BDO with our clients, we propose to offer an amount of 1.5 times the fees charged during the last fiscal year for any clients that were originated during our time at BDO, if we provide services for those clients after we are no longer with BDO. The amount would be paid over 5 equal annual installments, with the first payment at or within eighteen months after our departure.

Please let us know if you would like to discuss further.

Thanks.

102.        On August 15, 2023, upon information and belief all BDO wealth advisors, other

than Jeffery, Matt, and Kaitlyn were paid their earned incentive compensation for the prior fiscal

year.

103.        After Jeffery, Matt and Kaitlyn were not paid their earned incentive compensation,

they filed their Complaint in this action. (Dkt. 1).

104.        On August 18, 2023, Defendant BDO was served with the Complaint seeking,

among other things, the compensation owed to Jeffery, Matt and Kaitlyn.

105.        On August 19, 2023, Stephen Ferrara wrote Matt the following:

> Matt:
>
> The offer you made on behalf of yourself, Kaitlyn and Jeff, to pay 1.5 times the
> fees charged during the last fiscal year for any clients that were originated during your time
> at BDO is rejected as being wholly inadequate and not made in good faith.
>
> As an initial matter, the Firm purchased the Jacksonville practice in 2017 from Dave
> Albaneze, Jeff's father, for a significant price.  Your offer based on only those clients
> developed since that time ignores this fact, and therefore, is a non-starter. Moreover, each
> of you, Jeff, and Kaitlyn have a separate restrictive covenant in your Manager Agreement
> that, in the event you left BDO and misappropriated any client of BDO by performing
> services for, or arranging for any new firm to perform such services, would entitle BDO to
> recover from each of you damages at least in the amount of 1.5 times the annual fees.  For
> the Jacksonville practice, at annual fees of approximately $3 million, this would require
> each of you to pay as damages to BDO an amount no less than $4.5 million, for a total of
> $13.5 million.  Accordingly, we will not be countering your offer.
>
> Rather, we will continue with our plans to maintain the Jacksonville practice at BDO, as I
> previously relayed to you.  You and the other advisors in Jacksonville can continue to
> service the clients at our newly established RIA, BDO USA Wealth Advisors, LLC, under
> the same terms and conditions of employment, including the Manager Agreement.
>
> Thanks,
>
>  Steve

106.        On August 21, 2023, Matt wrote Stephen Ferrara the following:

17

Steve,

Thanks for responding to my email and making BDO's intentions clearer. We disagree with your interpretation of the Manager Agreement.

Please explain more about BDO's plans to maintain the Jacksonville practice at BDO. What do you mean when you say we'd be working under the same terms and conditions of employment? Does that mean that we will still be participants in an Incentive Compensation Plan, with the same terms and conditions?

Frankly, we have our doubts that our terms and conditions of employment could ever be the same, especially since all BDO wealth advisors, except for the three of us, have received their earned incentive compensation for the prior performance period. Additionally, there were several clients that were reassigned to new advisors that are going to Choreo. If your intention is for us to remain at BDO, when do you plan on letting the 22 Jacksonville clients that were reassigned know?

Please explain why BDO has failed to pay the three of us our earned incentive compensation for the prior performance period. BDO is causing harm to us and our families.

Thanks,

107.        On August 23, 2023, Stephen Ferrara responded as follows:


Matt:

As I previously stated, you will continue to be employed under the same terms and conditions under which you are currently employed, and you will continue to remain subject to the Manager Agreement. The only clients from the Jacksonville office that were reassigned are those current and former BDO partners who have indicated their intention to go to Choreo.

Furthermore, BDO has not failed to pay you incentive compensation.  You will be paid your incentive compensation by August 29, 2023, which is 60 days following the end of the performance period ending June 30, 2023, consistent with the terms of the incentive comp plan.

Steve

108.     On August 29, 2023, received their earned compensation.

109.     On August 31, 2023, BDO's counsel wrote to counsel for Jeffery, Matt, and Kaitlyn, confirming that Jeffery, Matt and Kaitlyn had been paid their owed compensation. BDO's counsel claimed that the timing of the payment complied with Section 8 of the incentive compensation plan, because it was no later than 60 days following the end of the July 1 through June 30 Performance Period. BDO's counsel also attached an incentive compensation plan document dated July 1, 2021, and requested Jeffery, Matt and Kaitlyn amend their complaint to remove Counts II and III.

110.     BDO's counsel failed to provide a reason that on August 15, 2023, all BDO wealth advisors other than Jeffery, Matt, and Kaitlyn, were paid their earned incentive compensation for the prior fiscal year.

111.     On September 1, 2023, counsel for Jeffery, Matt, and Kaitlyn responded to BDO's counsel and acknowledged his clients received their owed compensation albeit late. Counsel further stated that the document attached to counsel for BDO's email was different than the one previously provided to Jeffery, Matt, and Kaitlyn. Finally, counsel noted that all other BDO Wealth Advisors received their incentive compensation on August 15, 2023, and it was only after Jeffery, Matt, and Kaitlyn commenced this lawsuit that Mr. Ferrara acknowledged that they would be paid on August 29, 2023.

112.     In response to BDO's request, Jeffery, Matt and Kaitlyn agreed to amend their complaint to reflect payment.

## **FIRST CAUSE OF ACTION**

## **(DECLARATORY JUDGMENT)**

113.        Plaintiffs repeat and reallege the contents of ¶ 1 through ¶ 112 as if fully set forth

herein.

114.        On June 25, 2023, Stephen Ferrara threatened Jeffery, Matt, and Kaitlyn that BDO

could and would bring suit against them for clients who chose to be serviced by them after their

departure from BDO, unless they were employed by Choreo.

115.        Stephen Ferrara's threats included legal action even for clients who were acquired

and serviced by Jeffery, Matt, and Kaitlyn prior to their employment at BDO.

116.         The Manager Agreement includes a mechanism which addresses a manager's

departure from BDO.

117.        Paragraph 7 of the Manager Agreement provides that a manager would compensate

BDO, after their departure (whether by resignation, termination or otherwise), if he or she:

> "performs by himself/herself, or through an entity with which he/she is or becomes
> associated, or arranges for such entity to perform, engagements involving accounting,
> auditing, tax, investment advisory or consulting services, or any related services, for a
> Client (defined below) or causes a Client or Prospective Client (defined below) of the Firm
> to terminate its relationship with the Firm through unfair competition or business practices,
> including through the unauthorized use of Confidential Information, then Employee will
> compensate the Firm for the loss and damages suffered by the Firm by reason of lost
> engagement(s) by paying liquidated damages in an amount equal to the greater of -
> EITHER- (i) (A) one and one-half times the fees charged for such engagement(s) by the
> Firm for services performed by the Firm either (1) during the last full fiscal year or (2) the
> 12 month period prior to the last date upon which the Firm performed services for the
> Client which the Firm loses as a result of such breach, whichever is greater, or (B) in the
> case of a Prospective Client or a prospective engagement for a Client, one and one-half
> times the amount of the proposed fee for the next 12 months of such lost engagement(s) -
> OR- (ii) one and one-half times the amount of the fee paid for such lost engagement(s) in
> the 12 month period following Employee's departure from the Firm."

118.     Stephen Ferrara threatened to sue Jeffery, Matt, and Kaitlyn for an amount far greater than the liquidated damages provided for in Paragraph 7 of the Manager Agreement. (Manager Agreement, ¶ 7 (Ex. A).)

119.     For the first time, in his email of August 19, 2023, Stephen Ferrara claimed, among other things, that since Jeffery, Matt and Kaitlyn each had a separate restrictive covenant in their Manager Agreement that, in the event they all left BDO and "misappropriated" any client of BDO by performing services for, or arranging for any new firm to perform such services, BDO would be entitled to recover from each of them, 1.5 times the annual fees for that client.

120.     Paragraph 7 of the Manager Agreement sets forth the procedure to be followed if BDO clients depart with BDO managers.  Since the amount of damages has been fixed and agreed to by the parties, BDO's threats to sue for additional damages that would ruin Jeffery, Matt, and Kaitlyn were made in bad faith, to coerce them into signing the Choreo agreements.

121.     Additionally, Paragraph 7 of the Manager Agreement defines a "Client" as someone "with whom Employee has a relationship which the Firm enabled him/her to acquire, develop *and/or otherwise maintain* while employed by the Firm through his/her performance of services for such client or other activity…" [emphasis added]

122.     The Manager's Agreement is overbroad, as it is greater than is required for the protection of a legitimate business interest of BDO. *See, BDO Seidman v. Hirshberg*, 93 N.Y.2d 382 (1999).

123.     The position set forth in Stephen Ferrara's August 19, 2023 email that BDO would be entitled to recover from each of them damages at least in the amount of 1.5 times the annual fees for their "personal clients" (clients acquired and developed prior to their employment at BDO)

21

is overbroad, more restrictive than necessary to protect legitimate business interests and would be so excessive to actual damages, if any, as to constitute an unenforceable penalty.

124.         The Court should deem the entire restrictive covenant contained in the BDO Manager Agreement unenforceable because of BDO's bad faith in requiring Jeffery, Matt, and Kaitlyn to execute, prior to their employment, a restrictive covenant that had been, many years before, determined by the New York State Court of Appeals to be overbroad and more restrictive than necessary to protect legitimate business interests. *See, Flatiron Health, Inc. v. Carson*, 19 Civ. 8999 (VM), 2020 WL 1320867 (S.D.N.Y. March 20, 2020).

125.         A real and actual controversy exists, as BDO has threatened to sue Jeffery, Matt, and Kaitlyn and financially "ruin" them.  Declaratory relief is sought as to any obligation Jeffery, Matt, and Kaitlyn may have to compensate BDO, upon their departure from BDO, for their "personal clients" (clients acquired and developed prior to their employment at BDO) and whether BDO would be entitled to recover from Jeffery, Matt, and Kaitlyn <u>each</u>, damages in the amount of 1.5 times the annual fees for those clients.

126.         Jeffery, Matt, and Kaitlyn request a judicial determination of their rights and obligations, and a declaration that Paragraph 7 of the Manager Agreement is an unenforceable restrictive covenant as a matter of law.

<u>SECOND CAUSE OF ACTION</u>

<u>(RETALIATION BY M. BIEGEL AND BDO AGAINST KAITLYN FOR HER COMPLAINT)</u>

127.         Plaintiffs repeat and reallege the contents of ¶ 1 through ¶ 126 as if fully set forth herein.

128.     NYCHRL is codified in sections 8-101 *et seq.* of the Administrative Code of the City of New York ("NYC Admin. Code"), and was augmented by the Local Civil Rights Restoration Act of 2005, Local Law No. 85 of the City of New York (2005) (the "Restoration Act"). NYCHRL prohibits discrimination based on gender.  The core provision of the Restoration Act makes clear that NYCHRL is to be construed and applied liberally for the accomplishment of its uniquely broad and remedial purposes, regardless of whether the federal or New York State civil and human rights laws have been so construed.

129.     NYSHRL, set forth in Executive Law sections 290 *et seq*., defines and prohibits unlawful discriminatory practices by private and public employers. NYSHRL forbids discrimination on the basis of an individual's gender.  Executive Law section 296. In 2019, NYSHRL was amended to direct courts to construe the Human Rights Law liberally for the accomplishment of the "remedial" purposes thereof, "regardless of whether federal civil rights laws…have been so construed."  Executive Law section 300.

130.     Kaitlyn is a member of a protected class, an "employee" under section 8-107 (1)(a)(3) of the NYC Admin. Code, and an "individual" as defined under section 296(1)(a) of the Executive Law.

131.     BDO is an "employer" and a "covered entity" subject to the provisions of NYCHRL under section 8-107 (1)(a)(3) of the NYC Admin. Code, and an "employer" as defined under section 296(1)(a) of the Executive Law.

132.     At all relevant times, Kaitlyn was qualified and possessed the skills necessary for performance of her position.

133.     Despite Kaitlyn's qualifications, she was the target of harassment and materially adverse employment actions, giving rise to an inference of discrimination.

134.     Kaitlyn's gender was a factor and motivating factor in Defendants' decision to target her with offensive and disrespectful statements and behavior, and otherwise harass her more than her male counterparts.

135.     The harassment and numerous threats occurred under circumstances giving rise to an inference of discrimination.

136.     Kaitlyn reported to BDO's human resources department the harassment and numerous threats made to her and her family.

137.     In making her complaint to BDO's human resources department, Kaitlyn reasonably believed that Defendants were engaged in unlawful conduct and made her complaint in good faith.

138.     BDO's employee handbook contains a complaint procedure for reporting perceived acts of discrimination, harassment or retaliation. The handbook also states that BDO prohibits retaliation against anyone for honestly reporting suspected violations of discrimination or harassment.

139.     As a proximate result of Kaitlyn reporting Defendants' harassment and threats, Defendants retaliated against her by, among other things, reassigning some of her clients to others at BDO, and publicizing her complaint to others at BDO, including her clients.  As a result, Kaitlyn has suffered and continues to suffer substantial losses, including the loss of past and future earnings.

140.     As a further proximate result of Defendants' actions, Kaitlyn has suffered and continues to suffer impairment and damage to her good name, lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

141.     The conduct of Defendants was outrageous and was undertaken in a deliberate, callous, malicious, fraudulent, and oppressive manner intended to coerce Kaitlyn; was undertaken

with an improper and evil motive, amounting to malice and spite; and was undertaken in conscious disregard of Kaitlyn's rights.

142.        As a result, Kaitlyn is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiffs respectfully request the following relief:

(a) On the First Cause of Action, a summary declaratory judgment declaring that (1) Paragraph 7 of the Manager's Agreement is overbroad and an unenforceable restrictive covenant, and (2) BDO's assertion if Jeffery, Matt, and Kaitlyn left BDO and performed services for any of the clients they provided services while employed at BDO, BDO would be entitled to recover from <u>each</u> of them damages in the amount of 1.5 times the annual fees for those clients, constitutes an unlawful penalty;

(b) On the Second Cause of Action, an award of Kaitlyn's damages in an amount to be determined at trial but not less than $5,000,000.00 for loss of future income; together with an award of damages in an amount to be determined at trial but not less than $5,000,000.00 to compensate Kaitlyn for mental anguish, humiliation, embarrassment, and emotional injury; and an order enjoining Defendants from engaging, in the future, in the wrongful practices alleged herein;

(c)  An award of punitive damages;

(d)  An award of reasonable attorneys' fees, the costs of this action and interest according to law; and

(e)  Such other and further relief as is just and proper.

Dated:  New York, New York
         September 8, 2023

Respectfully submitted,

HUBELL & ASSOCIATES LLC

By:     *S/ Richard A. Hubell*
        Richard A. Hubell
        Attorneys for Plaintiffs
        260 Madison Avenue, 15th Floor
        New York, New York 10016
        (212) 682-7195