UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

JEFFERY T. ALBANEZE, MATTHEW B.          :
COCHRAN AND KAITLYN P. WEATHERLY,        :
                                         :
                    Plaintiffs,          :
          -against-                      :
                                         :
                                         :
                                         :
MARK D. BIEGEL AND BDO USA, P.A.,        :

                    Defendants.

------------------------------------------------------------------

Civil Action No. 1:23-cv-07197

**SECOND AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

     Plaintiffs JEFFERY T. ALBANEZE, MATTHEW B. COCHRAN, AND KAITLYN P. WEATHERLY by and through their undersigned counsel, as and for their second amended complaint against Defendants MARK D. BIEGEL and BDO USA, P.A. ("BDO") allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs Jeffery T. Albaneze, Matthew B. Cochran, and Kaitlyn P. Weatherly ("Jeffery", "Matt", and "Kaitlyn", collectively "Plaintiffs") seek a declaratory judgment with respect to their post-employment obligations, if any, under BDO's Manager Agreement (the "Manager Agreement").

2.      This action has also been brought for multiple acts of threats, intimidation, harassment, and retaliation perpetrated by Defendant Mark D. Biegel ("M. Biegel") and BDO against Kaitlyn and her team.

## THE PARTIES

3.       Jeffery is domiciled in and a citizen of the State of Florida.

4.       Matt is domiciled in and a citizen of the State of Florida.

5.       Kaitlyn is domiciled in and a citizen of the State of Florida.

6.       BDO is a professional services corporation organized under the laws of the State of Delaware with its principal place of business in the County of Cook, State of Illinois.

7.       M. Biegel is domiciled in and a citizen of the State of Maryland.

8.       M. Biegel is an attorney admitted to practice law in the State of Maryland and is also a certified public accountant.

9.       M. Biegel is currently employed by BDO as its Wealth Advisory National Leader, and regularly transacts business in New York.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.      In accordance with the Manager Agreement, the Parties agreed that the laws of the State of New York shall apply to any action brought under the Manager Agreement and that venue for any action or suit brought under the Manager Agreement will be in any federal or state court of competent jurisdiction in New York County, New York. (See BDO USA, LLP Manager Agreement ("Manager Agreement") (Ex. A; ¶19).)

## FACTS

### A.    Jeffery, Matt, and Kaitlyn worked together at LBA where they cultivated and originated numerous clients

12.        LBA Wealth Management LLC, ("LBA") was a small wealth advisory firm based in Jacksonville Florida.

13.        From June 2014 through May 2017, LBA Wealth Management LLC ("LBA") employed Jeffery as a wealth advisor/paraplanner.

14.        From January 2011 through May 2017, Matt was employed by LBA as a Portfolio Manager.

15.        From February 2014 through May 2017, Kaitlyn was employed by LBA as a wealth advisor.

16.        At LBA, Jeffery, Matt, and Kaitlyn originated numerous clients and specialized in providing wealth management services to those clients.

17.        While at LBA, Jeffery, Matt, and Kaitlyn developed personal and professional relationships with their clients.

### B.    In 2017, Jeffery, Matt, and Kaitlyn joined BDO as employees, and brought their clients with them

18.        In or about the spring of 2017, LBA informed its employees that it was being acquired by BDO.

19.        BDO offered Jeffery, Matt, and Kaitlyn employment as employees at will.

20.        Jeffery, Matt, and Kaitlyn were never offered partnership or an equity interest at BDO.

3

21.        Prior to their employment, BDO required Jeffery, Matt, and Kaitlyn to sign its Manager Agreement.  (Manager Agreement) (Ex. A).

22.        In May 2017, Jeffery, Matt, and Kaitlyn joined BDO as employees in its wealth advisory practice in Jacksonville, Florida.

23.        Jeffery, Matt, and Kaitlyn brought with them to BDO their client relationships that they had created and maintained at LBA.

24.        From 2017 to the present, Jeffery, Matt, and Kaitlyn worked together at BDO's wealth advisory practice and serviced many of the same clients that followed them from LBA to BDO.

25.        In addition to the clients Jeffery, Matt, and Kaitlyn brought to BDO, they developed and cultivated several relationships with new clients at BDO.

26.        Jeffery, Matt, and Kaitlyn have always performed their job duties in exemplary fashion.

**C.        In May 2023, BDO looks to exit the wealth advisory business and sell its wealth advisory practice to Choreo**

27.        On May 23, 2023, M. Biegel, BDO's Wealth Advisory National Leader, informed Matt and Kaitlyn that BDO was getting out of the wealth advisory business.

28.        M. Biegel stated the reason for BDO's exit from the wealth advisory business was that it presented inherent conflicts with BDO's substantial accounting and audit practices.

29.        M. Biegel said BDO was selling its wealth advisory business to private equity firm Choreo, LLC ("Choreo").

30.         M. Biegel said that a call would be set up the following week to introduce Matt and Kaitlyn to Choreo's CEO, Larry Miles ("L. Miles").

31.         On June 1, 2023, L. Miles contacted Kaitlyn and told her that she and Matt would receive offers of employment from Choreo by June 6, 2023.

32.         L. Miles made it clear that if Matt and Kaitlyn accepted Choreo's offer of employment, they would be required to sign new employment agreements, including Choreo's confidentiality and non-solicitation agreements.

33.         On June 6, 2023, M. Biegel called Jeffery, Matt, and Kaitlyn individually and explained in further detail that BDO would be selling its wealth advisory practice to Choreo.

34.         Jeffery, during his call with Mr. Biegel, inquired about the approximate deadline for when he, Matt, and Kaitlyn would have to review and sign Choreo's proposed new agreements, and asked how long they would have to negotiate their terms.

35.         M. Biegel responded, "Oh Jeffery, there will be no negotiating."  M. Biegel then suggested that since he (M. Biegel) is an attorney, once Jeffery, Matt, and Kaitlyn received Choreo's proposed agreements, M. Biegel would walk them through the terms and explain everything to them.

36.         On June 8, 2023, Matt and Kaitlyn received Choreo's proposed agreements, which included an offer letter, confidentiality and non-solicitation agreements, Unit Grant Agreement, and Advisor Incentive Overview.

37.        The terms of the proposed Choreo agreements were vastly different than the terms of the agreements Jeffery, Matt, and Kaitlyn had with BDO. These differences included, among other things, less compensation and significantly more restrictive post-employment obligations.

38.        On June 12, 2023, M. Biegel called Kaitlyn and inquired where she stood with respect to the proposed Choreo agreements. Kaitlyn reminded M. Biegel that she had only just received the proposed documents and had not yet had them reviewed by an attorney. M. Biegel stated that he really wanted her to go to Choreo, and said that he did not want to have to fly to Jacksonville to fire her support staff.

39.        M. Biegel also asked Kaitlyn whether she knew where Matt stood on his decision to join Choreo.

40.        On June 14, 2023, M. Biegel and Matt spoke.  During that conversation, Matt told M. Biegel that the compensation package proposed by Choreo was very different than what L. Miles and M. Biegel had previously told him would be the case, and the post-employment covenants were too restrictive because if he left Choreo for any reason, he could be prohibited from contacting any of his clients for two years. M. Biegel agreed with Matt that the post-employment restrictions were too restrictive and told Matt that he would look into it.

41.        On June 15, 2023, Matt and M. Biegel spoke again.  M. Biegel said that Choreo was going to adjust Matt's salary on the offer letter, but that his incentive compensation could not be guaranteed. M. Biegel also said that Choreo would not change the proposed post-employment restrictive covenants.

42.        On June 16, 2023, Matt and Kaitlyn each received an email from Choreo which included revised offer letters, together with the same confidentiality and non-solicitation agreements that they had previously received. The email to Kaitlyn indicated that the documents should be signed and returned no later than June 19, 2023.  The email to Matt indicated that the documents should be signed and returned no later than June 20, 2023.

43.        On June 16, 2023, Jeffery received his proposed offer letter, confidentiality and non-solicitation agreements, a Unit Grant Agreement, and an Advisor Incentive Overview, with a request to return his signed documents by June 19, 2023.

44.        Jeffery immediately responded to Choreo that he was away until June 20, 2023, visiting family for Father's Day weekend, and would review the documents when he returned.

45.        On June 21, 2023, M. Biegel met with Jeffery to inquire about Choreo's offer.

46.        Jeffery explained that he had only had one day to review the proposed documents but indicated that he had significant concerns about the proposed two-year "non-touch restrictive covenant" and the compensation package which included a bonus left to the discretion of Choreo, instead of a non-discretionary bonus.

47.        M. Biegel advised that despite what was written in the agreement, Choreo would "take care" of him, Matt, and Kaitlyn in terms of compensation.  He then said that if Jeffery or his colleagues were ever unhappy with the post-employment restrictions, Choreo would "work something out."  M. Biegel further advised that Jeffery and his colleagues should trust Choreo because Choreo would not want to make them upset, and if they were ever unhappy, they could simply leave.  M. Biegel then said that the restrictive covenants in Choreo's proposed agreements,

which prohibited contact with their own clients for two years, were most likely unenforceable as a matter of law.

48.        M. Biegel then told Jeffery, Matt, and Kaitlyn that they could rely on M. Biegel's legal background in lieu of waiting for their own attorneys' reviews.

49.        On June 21, 2023, L. Miles emailed Jeffery, Matt, and Kaitlyn to explain Choreo's compensation structure.  In sum and substance, L. Miles told Jeffery, Matt, and Kaitlyn that through 2023, their compensation would remain the same, and for 2024, they would continue to earn in accordance with BDO's incentive compensation schedule for the clients that followed them to Choreo.  Significantly, L. Miles then confirmed that Choreo was unwilling to commit to a compensation plan beyond 2024.

50.        Despite what L. Miles wrote in his email to Jeffery, Matt, and Kaitlyn, the proposed Choreo Agreements failed to include compensation which Jeffery, Matt, and Kaitlyn were entitled to receive under BDO's plan. Additionally, Choreo's proposed agreement included an incentive compensation plan which was discretionary as opposed to BDO's fixed, non-discretionary plan.

51.        On June 22, 2023, Jeffery advised M. Biegel that he had contacted multiple attorneys but had been unable to locate one that was both available and suitable to provide immediate legal advice regarding Choreo's proposed agreement.

52.        Jeffery then questioned what he perceived to be very one-sided commitments required under the agreements prepared by Choreo.

53.      At this point, M. Biegel said that Stephan Ferrara, BDO's Chief Operating Officer, demanded that Jeffery, Matt, and Kaitlyn sign the contracts with Choreo "as is," no later than the following day, June 23, 2023.

54.      M. Biegel then threatened Jeffery and said that Stephen Ferrara was "not the nicest person in the world," and that he (M. Biegel) was trying to keep things positive.

55.      M. Biegel then stated that Choreo had done as much as it could do, and if Jeffery, Matt, and Kaitlyn did not sign, Stephen Ferrara "is a jackass" and "has his way of doing things."

56.      Jeffery then asked M. Biegel what he would do if he was in Jeffery's position and told M. Biegel that he felt like he was not being given much of a choice.  M. Biegel responded that he understood if it felt like he and his colleagues had "a gun to their heads," and that if he, Matt, and Kaitlyn did not sign the Choreo agreements, Stephen Ferrara and BDO would "sue the shit" out of them.  M. Biegel reiterated that he wanted Jeffery, Matt, and Kaitlyn to go to Choreo happy, and not because Stephen Ferrara and BDO have "a gun to your head."

57.      Jeffery then asked, "what does that mean, a gun to our head?"  M. Biegel responded that Stephen Ferrara's way of solving everything is "with a hammer."  M. Biegel further threatened that BDO was drafting a "major lawsuit" against Jeffery, Matt, and Kaitlyn, which would be filed if they did not sign the Choreo agreements.

58.      M. Biegel reiterated again that if Jeffery, Matt, and Kaitlyn did not sign with Choreo, they would have to face Stephen Ferrara, who solves everything "with a hammer."

59.      M. Biegel then acknowledged that Jeffery and his colleagues were provided insufficient time to review Choreo's offer and related documents.  But M. Biegel made it clear that

the documents had to be signed by Jeffery, Matt, and Kaitlyn no later than lunchtime the following day.

60.	Jeffery responded that he had only had a short time to review the documents and would not be able to have an attorney review them by the following day.

61.	M. Biegel then started advising Jeffery on the legal implications of the restrictive covenants contained in the Choreo agreements and said, "I will go through and explain every item" and exclaimed, "I am a lawyer."  M. Biegel also stated that he would prefer that Stephen Ferrara not get involved because "he's a fucking asshole."

62.	Jeffery asked M. Biegel if it would be a problem if he was not ready to sign by the following day.  M. Biegel replied, maybe tomorrow by the end of day, and then Stephen Ferrara is going to tell you that what he does involves using a blunt hammer.  M. Biegel continued making threats and said to Jeffery that when you get to litigation, you bankrupt yourself and nobody wins.

63.	M. Biegel then referenced Matt and said that if Matt does not sign the Choreo agreement, BDO would sue Matt regardless of the merit of such a suit, just to ruin him.  M. Biegel then told Matt the story of Eric Sobota.  M. Biegel explained that Eric Sobota was a former BDO partner who had done some bad things, and that "BDO was not good either."  M Biegel continued by saying, "it was two shitting on each other," and BDO is going to bankrupt the guy.

64.	M. Biegel further explained that Eric Sobota's name is brought up at every BDO partner meeting, just to let the partners know that if they fail to comply with BDO's wishes, they will end up like him.  M. Biegel reiterated that BDO was going to bankrupt Sobota, and was unconcerned that his life was going to be ruined.

10

65.      M. Biegel then stated that people should "get the fuck out of BDO" because it's not a good organization.

66.      M. Biegel then said that the reason Stephen Ferrara is on his way out of BDO is because BDO's CEO, Wayne Berson, recognizes that BDO is going to lose a lot of talent if it utilizes someone who solves everything with a hammer.

67.      On June 22, 2023, M. Biegel again reached out to Kaitlyn to determine where she stood on Choreo's agreements.  Kaitlyn expressed her hesitancy about the two-year no contact prohibition with respect to her own clients, as well as other concerns.

68.      M. Biegel then told Kaitlyn the names of the BDO employees that had signed with Choreo and told her that she was holding up the process.  M. Biegel also told Kaitlyn that Stephen Ferrara was getting very upset.  M. Biegel then exclaimed, "Stephen Ferrara will destroy you; he will destroy your family; you're underestimating what not signing will do."  M. Biegel then went on to say that "Matt is underestimating what Stephen Ferrara will do.  He will destroy his family, he does not care."

69.      On June 22, 2023, M. Biegel and Kaitlyn had a follow-up call during which M. Biegel again made explicit threats, including that Stephen Ferrara is a "destroyer."  M. Biegel stated, "the only way Stephen Ferrara knows how to rule is with an iron thumb, and he just continues to pressure you."  M. Biegel then laughed and said, "if you want to have a home demolition party, you invite Stephen Ferrara, because he is the hammer and will help to destroy the family walls."  M. Biegel pleaded with Kaitlyn saying, "please sign, you have to sign."

70.        Kaitlyn asked why she was being threatened and told M. Biegel that she had not made any final decisions.  She said to M. Biegel that maybe she would be a stay-at-home mom. M. Biegel replied "If you plan to do that, you should just take the money from Choreo and then resign after the LTIP money hits so at least you get the money."  Kaitlyn replied that what M. Biegel proposed did not seem ethically right.  M. Biegel said she needed to decide, and Stephen Ferrara wanted to sign the deal by Friday, and that she was already holding everything up.

71.        On June 23, 2023, M. Biegel again called Jeffery and further pressed him on signing the Choreo agreements. Jeffery explained that he had contacted two attorneys to review the documents, and that neither was available immediately to provide him legal advice.

72.        M. Biegel then asked for Jeffery's final decision. Jeffery responded by asking if it was possible to simply honor his current employment agreement with BDO, which he signed six years ago.  M. Biegel responded that what Jeffery asked would not be possible.

73.        M. Biegel began laying out options should Jeffery and his colleagues not sign the Choreo agreements, threatening that Stephen Ferrara will be vindictive, and threatening that litigation is absolutely what BDO will do.

74.        Jeffery reiterated to M. Biegel that the agreement proposed by Choreo required him and his colleagues to make legal promises to Choreo, in exchange for no guarantee in return.  M. Biegel responded that they would have to have faith that their compensation would be taken care of and stated that the restrictive covenants in the Choreo agreements would not be enforceable.

75.        M. Biegel also advised Jeffery that at some point, Choreo would happily negotiate any future dispute that arose.  M. Beigel then suggested that Choreo could possibly raise Jeffery's

signing bonus from $100,000 to $200,000. Jeffery made it clear to M. Biegel that money was not his only issue, as the agreements as written would prevent him from serving his clients for two years after he was no longer employed by Choreo.

76.        Also on June 23, 2023, M. Biegel contacted Kaitlyn and again asked her where she stood on Choreo's agreements. M. Biegel stated that he was trying to keep Stephen Ferrara from calling her. Kaitlyn then told M. Biegel that she decided not to sign the Choreo agreements because they were too one-sided, and that they only benefited Choreo. M. Biegel then stated that what happens next was out of his hands, and that Monday would likely be her last day of work at BDO.

77.        After this call, Kaitlyn wrote to Catherine Moy in human resources at BDO. Kaitlyn's email stated:

> Dear Cathy,
>
> I'm a Managing Director with BDO Wealth in the Jacksonville, Florida office.
>
> I'd like to meet with you regarding recent conversations with Mark Biegel, the national director of BDO Wealth. During multiple discussions this week around signing the Choreo contract, I've been harassed, threatened and told my not signing would eliminate jobs in my local office.
>
> Please let me know your availability to discuss.
>
> Thank you,
>
> Kaitlyn Weatherly

78.        On Sunday, June 25, 2023, Jeffery, Matt, and Kaitlyn spoke with Stephen Ferrara. Stephen Ferrara told them that he was not able to address any of their concerns.

79.        Stephen Ferrara indicated that if their intentions were to leave BDO and take clients with them, he would have no choice but to protect BDO's assets and sue them, even if there was no legal basis, for damages including the economic loss to BDO for their refusal to sign Choreo's agreements.

80.        Jeffery, Matt, and Kaitlyn explained to Stephen Ferrara that they had not made any definitive plans, and that the three of them were considering their individual options, which included taking positions in another field or industry.

81.        Jeffery said to Stephen Ferrara that if his choices were between handcuffing himself to Choreo, and staring down the barrel of litigation that could bankrupt him, he may choose another option, which would involve looking for and taking a job where he does not get sued.

82.        Stephen Ferrara responded by asking Jeffery why he would not just take the money and stick it out for a year or two at Choreo.  Jeffery said that he could not, in good conscience, mislead his clients by taking them to a firm where he had no intention of staying.

83.        On June 26, 2023, Kaitlyn met with Meghan Joans, Regional Senior Manager of Human Resources at BDO, and reported the threats, intimidation, harassment, and disparate treatment that she was subjected to by M. Biegel, and informed Ms. Joans that she had been placed in an uncomfortable position during an already stressful time.  Kaitlyn complained that M. Biegel had clearly crossed a professional boundary and requested that her complaint be kept confidential.

84.        Despite Kaitlyn's request, her complaint was widely publicized within BDO.

85.        Kaitlyn's good faith complaint resulted in BDO's retaliation against her.

86.     For example, as soon as M. Biegel was made aware of Kaitlyn's complaint, he and BDO transferred several of her clients to another BDO wealth advisor.

### D.     Unable to coerce Jeffery, Matt, and Kaitlyn to sign the Choreo Agreements, BDO failed to make compensation payments due on June 30, 2023

87.     According to the terms of BDO's Incentive Compensation Plan dated October 17, 2019, BDO is obligated to pay incentive compensation to Jeffery, Matt, and Kaitlyn for the trailing twelve months, within 60 days of the fiscal year end.

88.     BDO's fiscal year ended on April 30, 2023.

89.     60 days after BDO's fiscal year end was June 29, 2023.

90.     BDO was obligated to pay Jeffery a total of $44,149.82 on or before June 29, 2023.

91.     BDO was obligated to pay Matt a total of $110,826.90 on or before June 29, 2023.

92.     BDO was obligated to pay Kaitlyn a total of $87,111.46 on or before June 29, 2023.

93.     Despite its legal obligation, BDO refused to pay Jeffery, Matt, and Kaitlyn their compensation.

94.     Jeffery, Matt, and Kaitlyn demanded payment of their compensation.

95.     On August 2, 2023, Matt and Kaitlyn had a telephone call with Stephen Ferrara. During the call, Mr. Ferrara asked if Matt and Kaitlyn were going to leave BDO if they were paid the compensation owed to them.

96.     Matt replied by explaining that his main concern was servicing his clients, which had been made increasingly more difficult because of the lack of direction from BDO and overall plan going forward, since BDO was exiting the wealth advisory business.

97.     Additionally, correspondence sent by BDO to wealth advisory clients, including those served by Jeffery, Matt, and Kaitlyn, indicated that changes to existing wealth management

advisors or client service teams were not expected, despite the sale to Choreo. Matt informed both M. Biegel and Stephen Ferrara that the information being provided to clients by BDO was false, because he, Jeffery, and Kaitlyn were not going to Choreo.

98.         At the heart of this dispute is the prospective obligations, if any, of Jeffery, Matt, and Kaitlyn, given among other things, that (1) BDO is selling its wealth advisory practice to Choreo, (2) Jeffery, Matt, and Kaitlyn declined to sign Choreo's employment offers,  (3) BDO had refused to pay Jeffery, Matt, and Kaitlyn their earned compensation until after they filed this lawsuit against the Defendants, (4) many of the clients serviced by Jeffery, Matt, and Kaitlyn  are their "personal clients" who were acquired and developed prior to their employment at BDO, and (5) BDO terminated the employment of Jeffery, Matt, and Kaitlyn for setting up a non-operational "placeholder" Registered Investment Advisor ("RIA") entity.

99.         On August 14, 2023, Matt wrote Stephen Ferrara as follows:

> It has always been our intention to remain BDO employees.
>
> Unfortunately, BDO decided to cease its wealth advisory practice and sell its wealth advisory business to Choreo. The employee agreements that Choreo offered to me, and which we were required to sign as a condition of our employment with Choreo, were very different than the terms of our BDO employment, and unacceptable.  For example, the Choreo confidentiality and non-solicitation agreements are significantly more restrictive than those in our current agreements with BDO. We were informed that the Choreo agreements were not negotiable, and that softening of the covenants "was not going to happen."
>
> If the terms of our continued employment must change so significantly, we have no alternative but to find other means to support our families.
>
> As you have requested that we make you an offer to leave BDO with our clients, we propose to offer an amount of 1.5 times the fees charged during the last fiscal year for any clients that were originated during our time at BDO, if we provide services for those clients after we are no longer with BDO. The amount would be paid over 5 equal annual installments, with the first payment at or within eighteen months after our departure.
>
> Please let us know if you would like to discuss further.

Thanks.

100.     On August 15, 2023, upon information and belief, all BDO wealth advisors other than Jeffery, Matt, and Kaitlyn had been paid their earned incentive compensation for the prior fiscal year.

101.     After Jeffery, Matt, and Kaitlyn were not paid their earned incentive compensation, they commenced this action. (Dkt. 1).

102.     Jeffery, Matt, and Kaitlyn were employed by BDO as of the date of the filing of the Complaint.

103.     On August 18, 2023, Defendant BDO was served with the Complaint seeking, among other things, the compensation owed to Jeffery, Matt, and Kaitlyn.

104.     On August 19, 2023, Stephen Ferrara wrote Matt:

> The offer you made on behalf of yourself, Kaitlyn and Jeff, to pay 1.5 times the fees charged during the last fiscal year for any clients that were originated during your time at BDO is rejected as being wholly inadequate and not made in good faith.
>
> As an initial matter, the Firm purchased the Jacksonville practice in 2017 from Dave Albaneze, Jeff's father, for a significant price.  Your offer based on only those clients developed since that time ignores this fact, and therefore, is a non-starter. Moreover, each of you, Jeff, and Kaitlyn have a separate restrictive covenant in your Manager Agreement that, in the event you left BDO and misappropriated any client of BDO by performing services for, or arranging for any new firm to perform such services, would entitle BDO to recover from each of you damages at least in the amount of 1.5 times the annual fees.  For the Jacksonville practice, at annual fees of approximately $3 million, this would require each of you to pay as damages to BDO an amount no less than $4.5 million, for a total of $13.5 million.  Accordingly, we will not be countering your offer.
>
> Rather, we will continue with our plans to maintain the Jacksonville practice at BDO, as I previously relayed to you.  You and the other advisors in Jacksonville can continue to service the clients at our newly established RIA, BDO USA Wealth Advisors, LLC, under the same terms and conditions of employment, including the Manager Agreement.

105.     On August 21, 2023, Matt wrote Stephen Ferrara the following:

Thanks for responding to my email and making BDO's intentions clearer. We disagree with your interpretation of the Manager Agreement.

Please explain more about BDO's plans to maintain the Jacksonville practice at BDO. What do you mean when you say we'd be working under the same terms and conditions of employment? Does that mean that we will still be participants in an Incentive Compensation Plan, with the same terms and conditions?

Frankly, we have our doubts that our terms and conditions of employment could ever be the same, especially since all BDO wealth advisors, except for the three of us, have received their earned incentive compensation for the prior performance period. Additionally, there were several clients that were reassigned to new advisors that are going to Choreo. If your intention is for us to remain at BDO, when do you plan on letting the 22 Jacksonville clients that were reassigned know?

Please explain why BDO has failed to pay the three of us our earned incentive compensation for the prior performance period. BDO is causing harm to us and our families.

106.     On August 23, 2023, Stephen Ferrara responded to Matt as follows:

As I previously stated, you will continue to be employed under the same terms and conditions under which you are currently employed, and you will continue to remain subject to the Manager Agreement. The only clients from the Jacksonville office that were reassigned are those current and former BDO partners who have indicated their intention to go to Choreo.

Furthermore, BDO has not failed to pay you incentive compensation.  You will be paid your incentive compensation by August 29, 2023, which is 60 days following the end of the performance period ending June 30, 2023, consistent with the terms of the incentive comp plan.

107.     On August 29, 2023, Jeffery, Matt, and Kaitlyn received their earned compensation.

108.     On August 31, 2023, BDO's counsel wrote to counsel for Jeffery, Matt, and Kaitlyn,

confirming that Jeffery, Matt, and Kaitlyn had been paid their owed compensation. BDO's counsel

claimed that the timing of the payment complied with Section 8 of the incentive compensation

plan, because it was made no later than 60 days following the end of the July 1 through June 30

Performance Period. BDO's counsel also attached an incentive compensation plan document dated

July 1, 2021, and requested Jeffery, Matt, and Kaitlyn amend their Complaint to remove Counts II and III.

109.     BDO's counsel failed to provide a reason that on August 15, 2023, all BDO wealth advisors other than Jeffery, Matt, and Kaitlyn, were paid their earned incentive compensation for the prior fiscal year.

110.     On September 1, 2023, counsel for Jeffery, Matt, and Kaitlyn responded to BDO's counsel and acknowledged his clients received their owed compensation, albeit late. Counsel further stated that the document attached to the email sent by BDO's counsel was different than the one previously provided to Jeffery, Matt, and Kaitlyn. Finally, counsel noted that all other BDO wealth advisors received their incentive compensation on August 15, 2023.

111.     It was only after Jeffery, Matt, and Kaitlyn commenced this lawsuit that Mr. Ferrara acknowledged that they would be paid on August 29, 2023.

112.     In response to BDO's request that Jeffery, Matt, and Kaitlyn amend their complaint to reflect payment, Jeffery, Matt, and Kaitlyn agreed.

113.     On September 8, 2023, Jeffery, Matt, and Kaitlyn filed their First Amended Complaint ("FAC") (Dkt. 8).

114.     On September 20, 2023, Jeffery, Matt, and Kaitlyn provided BDO written notification that they had formed an RIA entity.

115.      In the written notification provided to BDO, Jeffery, Matt, and Kaitlyn represented that the RIA entity was not operational, had conducted no business activities, and would not conduct any business activities without providing BDO proper notification.

116.     In the same notice, Jeffery, Matt, and Kaitlyn set forth the reasons for  their forming the RIA, including (1) the unfair treatment they were subjected to by Defendants as set forth in the

FAC, (2) the uncertainty of their employment with BDO after they refused to join the purchaser of BDO's wealth advisory practice, and (3) the necessity of having a legal means to continue to provide services to their long-standing clients (most of whom were acquired by Jeffery, Matt, and Kaitlyn before joining BDO), in the event that BDO's wealth advisory business ceased operations.

117.        At no time during their employment at BDO did Jeffery, Matt, and Kaitlyn ever solicit any clients to leave BDO.

118.        On September 22, 2023, in the midst of discussions relating to the resolution of all outstanding issues, BDO summarily terminated the employment of Jeffery, Matt, and Kaitlyn. BDO pretextually cited the formation of the RIA as grounds for their termination for cause.

119.        The terminations were communicated to Jeffery, Matt, and Kaitlyn via a letter sent by Stephen Ferrara of BDO on September 22, 2023.

120.        Stephen Ferrara's letter to Jeffery, Matt, and Kaitlyn falsely claimed that "you have been conspiring to hatch a competing business with the intent of harming BDO and unfairly stealing BDO's clients in breach of your legal obligations to BDO."

121.        The correspondence continued: "We are also now aware of the fact that you formed the entity on July 25, 2023, thus indicating that your disloyal conduct and efforts to create a competing business while stealing clients began no less than two months ago, likely much earlier."

122.        Stephen Ferrara's correspondence cited, as "context" for the terminations, Jeffery, Matt, and Kaitlyn's pending lawsuit and disloyal conduct.

123.        Finally, Stephen Ferrara's correspondence stated that "Properly framed, we view your brazen creation of a competing RIA while still employed with BDO as a constructive resignation.  Put simply, you forced this termination."

124.     BDO has never claimed, nor is there any factual basis for BDO to claim, that Jeffery, Matt, and Kaitlyn ever used confidential information, secrets, or resources of BDO in forming the RIA, or that the RIA was even operational at any time prior to their termination.

125.     BDO's reliance on the creation of the RIA entity as the basis for the terminations of Jeffery, Matt, and Kaitlyn was a pretext and not a lawful basis for a for-cause termination. *DeWitt Stern Group, Inc. v. Eisenberg*, 734 F. App'x. 48, 51 (2d Cir. 2018) (employee may prepare to compete and create competing business prior to leaving his employer without breaching any fiduciary duty so long as he does not improperly use the employer's time, facilities, or proprietary secrets).

126.     BDO demanded that Jeffery, Matt, and Kaitlyn re-affirm their post-employment obligations and pay BDO a significant sum of money

127.     Specifically, BDO threatened, among other things, that if Jeffery, Matt, and Kaitlyn did not do what BDO demanded within one week of receipt of BDO's letter, including remitting more than $13 million to BDO, BDO would "commence litigation" against them.

128.     The post-employment obligations at issue have been determined by the New York State Court of Appeals to be overbroad.

129.     Additionally, BDO terminated the employment of Jeffery, Matt, and Kaitlyn without proper cause.

130.     Upon information and belief, BDO's conduct is and was intended to threaten and intimidate Jeffery, Matt, and Kaitlyn and improperly dissuade them and other BDO employees from, among other things, earning a livelihood in their chosen profession, and engaging in protected activity.

131.     Upon information and belief, BDO is aware that the non-solicitation covenant at issue is unenforceable against Jeffery, Matt, and Kaitlyn given, among other reasons, (1) the covenant's overbreadth, (2) the arbitrary and excessive liquidated damages provision, uncorrelated to any actual damages or lost profits, is a penalty clause, (3) the terminations of Jeffery, Matt, and Kaitlyn without proper cause, and (4) BDO's stated intent of exiting the wealth advisory business.

## FIRST CAUSE OF ACTION

## (DECLARATORY JUDGMENT)

132.     Plaintiffs repeat and reallege the contents of ¶ 1 through ¶ 131 as if fully set forth herein.

133.     On June 25, 2023, Stephen Ferrara threatened Jeffery, Matt, and Kaitlyn that BDO could and would sue them for clients who chose to be serviced by them after their departure from BDO, unless they were employed by Choreo.

134.     Stephen Ferrara's threats included legal action for clients who were acquired and serviced by Jeffery, Matt, and Kaitlyn prior to their employment at BDO.

135.     The Manager Agreement includes a mechanism which addresses a manager's departure from BDO.

136.     Paragraph 7 of the Manager Agreement provides that a manager would compensate BDO, after their departure (whether by resignation, termination or otherwise), if he or she:

> "performs by himself/herself, or through an entity with which he/she is or becomes associated, or arranges for such entity to perform, engagements involving accounting, auditing, tax, investment advisory or consulting services, or any related services, for a Client (defined below) or causes a Client or Prospective Client (defined below) of the Firm to terminate its relationship with the Firm through unfair competition or business practices, including through the unauthorized use of Confidential Information, then Employee will compensate the Firm for the loss and damages suffered by the Firm by reason of lost

engagement(s) by paying liquidated damages in an amount equal to the greater of - EITHER- (i) (A) one and one-half times the fees charged for such engagement(s) by the Firm for services performed by the Firm either (1) during the last full fiscal year or (2) the 12 month period prior to the last date upon which the Firm performed services for the Client which the Firm loses as a result of such breach, whichever is greater, or (B) in the case of a Prospective Client or a prospective engagement for a Client, one and one-half times the amount of the proposed fee for the next 12 months of such lost engagement(s) - OR- (ii) one and one-half times the amount of the fee paid for such lost engagement(s) in the 12 month period following Employee's departure from the Firm."

137.      Stephen Ferrara, on behalf of BDO, has repeatedly threatened to sue Jeffery, Matt, and Kaitlyn for an amount far greater than the liquidated damages provided for in Paragraph 7 of the Manager Agreement. (Manager Agreement, ¶ 7 (Ex. A).)

138.      For the first time, in his email of August 19, 2023, Stephen Ferrara claimed, among other things, that since Jeffery, Matt, and Kaitlyn each had a separate restrictive covenant in their Manager Agreement providing that in the event they all left BDO and "misappropriated" any client of BDO by performing services for them, or arranging for any new firm to perform such services, BDO would be entitled to recover, from _each_ of them, 1.5 times the annual fees for that client.

139.      Paragraph 7 of the Manager Agreement sets forth the procedure to be followed if BDO clients depart with BDO managers.  Since the amount of damages has been fixed and agreed to by the parties, BDO's threats to sue for additional damages that would ruin Jeffery, Matt, and Kaitlyn were made in bad faith.

140.      Additionally, Paragraph 7 of the Manager Agreement defines a "Client" as someone "with whom Employee has a relationship which the Firm enabled him/her to acquire, develop *and/or otherwise maintain* while employed by the Firm through his/her performance of services for such client or other activity…" [emphasis added]

141.     The Manager Agreement is overbroad, as it is greater than is required for the protection of a legitimate business interest of BDO. *See, BDO Seidman v. Hirshberg*, 93 N.Y.2d 382 (1999).

142.     The position set forth in Stephen Ferrara's August 19, 2023 email was that BDO would be entitled to recover from <u>each</u> of Jeffery, Matt, and Kaitlyn damages of at least 1.5 times of the annual fees for the entire Jacksonville practice.

143.     Additionally, Stephen Ferrara's position regarding the amount BDO would be entitled to recover from Jeffery, Matt, and Kaitlyn includes recovery for clients acquired and developed prior to Jeffery's, Matt's, and Kaitlyn's employment at BDO, and is therefore based on restrictions that are overbroad and more restrictive than necessary to protect any legitimate business interest of BDO.

144.     Additionally, the amount BDO has sought to recover, based on Stephen Ferrara's threatened position, is significantly more than any actual damages sustained and would constitute an unenforceable penalty.

145.     The Court should deem the entire restrictive covenant contained in the BDO Manager Agreement unenforceable because, among other reasons, BDO acted in bad faith by requiring Jeffery, Matt, and Kaitlyn to execute, prior to their employment, a restrictive covenant that had been, many years before, determined by the New York State Court of Appeals to be overbroad and more restrictive than necessary to protect legitimate business interests.

146.     A real and actual controversy exists, as BDO has threatened to sue Jeffery, Matt, and Kaitlyn and financially "ruin" them.  Declaratory relief is sought as to any obligation Jeffery, Matt, and Kaitlyn may have to compensate BDO for their "personal clients" (clients acquired and developed prior to their employment at BDO) and whether BDO would be entitled to recover from

24

Jeffery, Matt, and Kaitlyn each, damages in the amount of 1.5 times the annual fees for those clients.

147.     Jeffery, Matt, and Kaitlyn request a judicial determination of their rights and obligations, and a declaration that Paragraph 7 of the Manager Agreement is overbroad and unenforceable.

**SECOND CAUSE OF ACTION**

**(RETALIATION BY M. BIEGEL AND BDO AGAINST KAITLYN FOR HER GOOD-FAITH COMPLAINT TO HR)**

148.     Plaintiffs repeat and reallege the contents of ¶ 1 through ¶ 147 as if fully set forth herein.

149.     NYCHRL is codified in sections 8-101 *et seq.* of the Administrative Code of the City of New York ("NYC Admin. Code"), and was augmented by the Local Civil Rights Restoration Act of 2005, Local Law No. 85 of the City of New York (2005) (the "Restoration Act"). NYCHRL prohibits discrimination based on gender.  The core provision of the Restoration Act makes clear that NYCHRL is to be construed and applied liberally for the accomplishment of its uniquely broad and remedial purposes, regardless of whether the federal or New York State civil and human rights laws have been so construed.

150.     NYSHRL, set forth in Executive Law sections 290 *et seq*., defines and prohibits unlawful discriminatory practices by private and public employers. NYSHRL forbids discrimination on the basis of an individual's gender.  Executive Law section 296. In 2019, NYSHRL was amended to direct courts to construe the Human Rights Law liberally for the accomplishment of the "remedial" purposes thereof, "regardless of whether federal civil rights laws…have been so construed."  Executive Law section 300.

151.     Kaitlyn is a female and a member of a protected class.

152.     At all relevant times, Kaitlyn was qualified and possessed the skills necessary for performance of her position.

153.     Despite Kaitlyn's qualifications, she was the target of harassment and materially adverse employment actions, giving rise to an inference of discrimination.

154.     Kaitlyn's gender was a factor and motivating factor in Defendants' decision to target her with offensive and disrespectful statements and behavior, and otherwise harass her more than her male counterparts.

155.     The harassment and numerous threats occurred under circumstances giving rise to an inference of discrimination.

156.     Kaitlyn reported to BDO's human resources department the harassment and numerous threats made to her and her family.

157.     Kaitlyn's complaints were made in accordance with BDO's Workplace Guide which contains specific language prohibiting retaliation, and in relevant part states:

> All BDO partners and employees are responsible for helping to ensure that our work environment is free from prohibited discrimination and harassment. Everyone is encouraged to report such conduct to Firm management.
>
> No Retaliation: BDO prohibits retaliation against anyone for honestly reporting suspected violations of this policy, or for participating in the investigation of a complaint. Retaliation will not be tolerated. If you think you have been retaliated against, or have witnessed retaliation, you should report it immediately using the procedure outlined above. Reports of retaliation will be investigated immediately.

158.     BDO's No Retaliation policy is distinct and mandatory.

159.     In making her complaint to BDO's human resources department, Kaitlyn clearly and unequivocally conveyed to BDO that she was being targeted as a mother with young children and was afraid.

160.        Kaitlyn reasonably believed that Defendants were engaged in unlawful conduct and made her complaints in good faith.

161.        Instead of addressing Kaitlyn's complaint and concerns, Defendants retaliated against her by, among other things, reassigning some of her clients to others at BDO, and publicizing her complaint to others at BDO, including her clients.

162.         Defendant Biegel aided and abetted in the retaliatory conduct.

163.        As a result of BDO's retaliation, Kaitlyn has suffered and continues to suffer substantial losses, including the loss of past and future earnings.

164.        As a further proximate result of Defendants' actions, Kaitlyn has suffered and continues to suffer impairment and damage to her good name, lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

165.        The conduct of Defendants was outrageous and was undertaken in a deliberate, callous, malicious, fraudulent, and oppressive manner intended to bully and coerce Kaitlyn; was undertaken with an improper and evil motive, amounting to malice and spite; and was undertaken in conscious disregard of Kaitlyn's rights.

166.        As a result, Kaitlyn is entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**

**(RETALIATION AGAINST JEFFERY, MATT, AND KAITLYN FOR THEIR COMMENCEMENT OF THIS ACTION AND FILING A FIRST AMENDED COMPLAINT)**

167.        Plaintiffs repeat and reallege the contents of ¶ 1 through ¶ 166 as if fully set forth herein.

168.        In the FAC, Kaitlyn alleged, *inter alia*, that (1) she was the target of harassment resulting in adverse employment actions giving rise to an inference of discrimination (FAC at

¶133), (2) her gender was a factor and motivating factor in Defendants' decision to target her (FAC at ¶134), and (3) the harassment and threats she was subjected to give rise to an inference of discrimination (FAC at ¶135).

169.     Jeffery and Matt were witnesses to and have supported Kaitlyn's good faith claims of discrimination and harassment.

170.     For example, after Kaitlyn complained to BDO's HR department, Matt confirmed to BDO that as a mom with kids, Kaitlyn had been targeted and harassed more than him and Jeffery, male employees.

171.     The filing of Plaintiffs' FAC alleging acts of discrimination and harassment is a protected activity.

172.     At the time that Jeffery, Matt, and Kaitlyn engaged in protected activity, they had a reasonable, good faith belief that the underlying conduct by Defendants violated the law.

173.     The termination of Jeffery, Matt, and Kaitlyn was without cause and constitutes, *inter alia,* retaliation against them for the commencement of this action, filing the FAC, and engaging in protected activity.

174.     As a result of BDO's retaliation, Plaintiffs have suffered and continue to suffer substantial losses, including the loss of past and future earnings.

175.     As a further proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer impairment and damage to their good name, lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

176.     The conduct of Defendants was outrageous and was undertaken in a deliberate, callous, malicious, fraudulent, and oppressive manner; was undertaken with an improper and evil

motive, amounting to malice and spite; and was undertaken in conscious disregard of Plaintiffs' rights.

177.        As a result, Plaintiffs are entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION

## (DEFAMATION BY BDO)

178.        Plaintiffs repeat and reallege the contents of ¶ 1 through ¶ 177 as if fully set forth herein.

179.         On or about September 29, 2023, Mr. Michael Lynch, a BDO employee in the course of his employment, contacted a client that Matt had brought to BDO, and misrepresented to that client the basis of Matt's termination. Specifically, Mr. Lynch repeatedly told the client that BDO had terminated Matt's employment for cause.

180.        On or about September 29, 2023, Mr. Lynch contacted a client that Jeffery had brought to BDO and misrepresented to that client the basis of the termination of Jeffery, Matt and Kaitlyn. Specifically, Mr. Lynch repeatedly told the client that BDO had terminated the employment of Jeffery, Matt and Kaitlyn for cause.

181.        On or about October 5, 2023, a BDO employee contacted a client that Kaitlyn had brought to BDO and misrepresented to that client the basis of Kaitlyn's termination. The BDO employee repeatedly told the client that BDO had terminated Kaitlyn's employment for cause and that she had done something wrong.

182.        On information and belief, BDO made these statements with actual malice, knowing that they were false.

183.        On information and belief, these unsolicited false statements were designed to cause clients to sever their long-time business relationships with Jeffery, Matt, and Kaitlyn and cause harm to the reputations of Jeffery, Matt, and Kaitlyn.

184.        As unsolicited statements presented to an audience that lacked a legitimate business interest to hear and know the information, these statements are not entitled to any qualified privilege.

185.        BDO's actions constitute defamation per se under New York common law, as they caused injury to Plaintiffs' trade, business, and profession.

186.        In addition, BDO's actions also entitle Plaintiffs to the remedies provided under the common law, including but not limited to actual damages, general damages, compensatory damages, and punitive damages in amounts to be determined at trial, but in no event less than $500,000.00.

**WHEREFORE**, Plaintiffs respectfully request the following relief:

(a) On the First Cause of Action, a summary declaratory judgment declaring that (1) Paragraph 7 of the Manager's Agreement is overbroad and an unenforceable restrictive covenant, and (2) BDO's assertion if Jeffery, Matt, and Kaitlyn left BDO and performed services for any of the clients they provided services while employed at BDO, BDO would be entitled to recover from each of them damages in the amount of 1.5 times the annual fees for those clients, constitutes an unlawful penalty;

(b)  On the Second Cause of Action, an award of Kaitlyn's damages in an amount to be determined at trial but not less than $5,000,000.00 for loss of future income; together with an award of damages in an amount to be determined at trial but not less than $5,000,000.00 to compensate Kaitlyn for mental anguish, humiliation, embarrassment, and emotional injury; and an order enjoining Defendants from engaging, in the future, in the wrongful practices alleged herein;

(c) On the Third Cause of Action, an award of Plaintiffs' damages in an amount to be determined at trial but not less than $5,000,000.00; and an order enjoining Defendants from engaging, in the future, in the wrongful practices alleged herein;

(d)  On the Fourth Cause of Action, an award of Plaintiffs' damages in an amount to be determined at trial but not less than $500,000.00;

(f)  An award of punitive damages;

(g)  An award of reasonable attorneys' fees, the costs of this action and interest according to law; and

(h)  Such other and further relief as is just and proper.


Dated:  New York, New York
        October 20, 2023

                                    Respectfully submitted,

                                    HUBELL & ASSOCIATES LLC

                        By:     _S/ Richard A. Hubell_
                                Richard A. Hubell
                                Attorneys for Plaintiffs
                                260 Madison Avenue, 15th Floor
                                New York, New York 10016
                                (212) 682-7195